J-A10027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KATHERINE M. PURCELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CAROLE CAPLES | : | No. 1818 EDA 2023 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2019-C-1929

| | | |
|---|---|---|
| CAROLE LEE CAPLES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KATHERINE M. PURCELL | : | No. 1963 EDA 2023 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2021-C-2083

| | | |
|---|---|---|
| KATHERINE M. PURCELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CAROLE CAPLES | : | |
| | : | |
| Appellant | : | No. 1964 EDA 2023 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2019-C-1929

| | | |
|---|---|---|
| CAROLE LEE CAPLES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

|  | : |  |
| --- | --- | --- |
| v. | : | |
|  | : | |
|  | : | |
| KATHERINE M. PURCELL | : | |
|  | : | |
| Appellant | : | No. 1210 EDA 2024 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2021-C-2083

BEFORE:   PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BECK, J.:                **FILED NOVEMBER 14, 2025**

In these consolidated cases, Appellant Katherine M. Purcell ("Purcell") appeals and Appellee/Cross-Appellant Carole Lee Caples ("Caples") cross-appeals from the judgment entered by the Lehigh County Court of Common Pleas ("trial court") in favor of Caples and against Purcell in the amount of $168,107 and in favor of Purcell and against Caples in the amount of $77,461.86.  We affirm in part and reverse in part.

Caples, born in June 1942, has three daughters, Purcell, Christine Cullen ("Cullen"), and Kimberly D'Alessandro ("D'Alessandro").  On February 5, 2010, Caples bought a home in Whitehall, Pennsylvania ("the Whitehall Property").  Purcell gave Caples money to purchase the Whitehall Property, which Caples immediately paid back after the sale of her home in Maryland. The deed of the Whitehall Property listed Caples and Purcell as joint tenants

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

with the right of survivorship. Caples lived in and paid the bills for the Whitehall Property; Purcell never resided there.

In 2012, Purcell started two investment companies, KP Investments, LLC ("KP") and KC Property Investments, LLC ("KC"), to purchase, renovate, and rent properties in Maryland. Caples initially invested $1,500 in KP and became a two percent member of that company, and invested $75,898.89 in KC and became a fifty percent member of that company. KP and KC had accounts with the Pennsylvania State Employees Credit Union ("PSECU"), and Purcell and Caples were listed as authorized signers on those accounts. In March 2019, Caples sold her interest in KP to her grandson, Corey Purcell, for $2,400.

On May 21, 2018, Caples executed a general power of attorney appointing Purcell as her agent. Caples also updated her will, which stated that she would distribute her estate equally between her three daughters. On October 11, 2018, Caples executed a new durable power of attorney, which again appointed Purcell as her agent. Caples also executed a health care power of attorney, naming Purcell as her agent and D'Allessandro and Cullen as her alternative agents. However, on October 15, 2018, Caples executed a new health care power of attorney, designating all three daughters as co-agents.

In the interim, in 2018, Caples had hip surgery and decided to move to a retirement community, Fellowship Community. To be admitted into

Fellowship Community, Caples had to pay an entrance fee of approximately $203,000. Purcell agreed to loan Caples $192,850 to aid in paying the fee. Purcell and Caples signed a promissory note for $192,500 on July 1, 2018. The note included a loan amortization schedule, which required Caples to make monthly payments of $975.60 beginning on November 1, 2018. Caples sold the Whitehall Property on October 18, 2018, receiving net proceeds of $262,519.75, and a refund for overpayment of her sewer bill in the amount of $63.33.[1] Purcell and Caples each received half of the total proceeds from the sale. Caples deposited her share of the sale proceeds in a bank account she shared with D'Alessandro. Following closing, D'Alessandro and Cullen, on behalf of Caples, asked Purcell the amount remaining on the note for the Fellowship Community loan. Pursell did not immediately respond.

On October 7, 2018, Purcell transferred $23,873.70 from another joint PSECU account she shared with Caples to her own personal account. On November 24, 2018, Purcell instructed Caples to pay her $100,000, to be paid toward the principal of the note, and included a new loan amortization schedule requiring Caples to make monthly payments of $469.71 over twenty years to pay off the remaining principal. Additionally, Purcell directed Caples to deposit $30,850 in a joint PSECU account in both their names from which the monthly loan payments would be made to Purcell. Purcell also sought to

_____

[1] In October 2018, Caples' doctor diagnosed her with late onset Alzheimer's disease without behavioral disturbance primary.

have Caples name only Purcell as agent on her healthcare power of attorney. Caples did not make the requested change to her healthcare power of attorney, and as a result, Purcell resigned as Caples' healthcare power of attorney on January 14, 2019. On January 20, 2019, Purcell removed $28,528.39 from the PSECU account she shared with Caples and moved the money into a personal PSECU account. The $469.71 payments were made in February, March, and April 2019.

On February 21, 2019, Caples revoked her prior general power of attorney and executed a new power of attorney, naming D'Alessandro and Cullen as her agents. In March 2019, Caples left the Fellowship Community and moved to Alabama with D'Alessandro. At this time, D'Alessandro and Caples discovered Caples' name on the PSECU accounts, including the KP and KC accounts. Subsequently, D'Alessandro withdrew $473.12 from the PSECU account Caples shared with Purcell, $25,000 from the KP PSECU account, and $20,000 from the KC business account and placed the money into an account she held jointly with Caples. On May 10, 2019, Purcell sent Caples a letter stating that she was in default on her monthly loan payments.

On May 14, 2019, Cullen and D'Alessandro filed a "Petition to Compel Respondent Katherine M. Purcell to File an Accounting Pursuant to 20 Pa.C.S. § 5610" in the orphans' court division. Cullen and D'Alessandro sought an accounting of Purcell's activities while she served as Caples' power of attorney.

Purcell filed an answer and new matter. On August 30, 2019, Purcell filed an accounting. Cullen and D'Alessandro filed objections to the accounting.

Caples, through Cullen and D'Alessandro, also filed a petition for breach of fiduciary duty against Purcell. In her petition for breach of fiduciary duty, Caples, through Cullen and D'Alessandro, averred that Purcell served as Caples' agent from May 21, 2018, to February 21, 2019, and during this time Purcell was in a confidential relationship with Caples. Petition for Breach, 9/18/2019, ¶¶ 19-20. Purcell "breached her fiduciary duty and exerted undue influence over [Caples] by convincing [her] to borrow money from [Purcell]." *Id.* ¶ 22. Caples argued that she "borrowed $200,000 from [Purcell], and was required to pay interest back on the loan." *Id.* ¶ 24. According to Caples, Purcell "unduly influenced [her] to sign a loan agreement on July 1, 2018, which benefitted [Purcell] and was in breach of [Purcell's] fiduciary duty to [Caples]." *Id.* ¶ 23; *see also id.*, Exhibit E (Loan document, dated July 1, 2018, indicating Purcell loaned Caples approximately $200,000 and signed by both Caples and Purcell in their individual capacities). Caples claimed the loan improperly benefited Purcell, noting Purcell violated section 5601.3 of the statute concerning powers of attorney ("the POA Act")[2] by failing to act in

[2] Relevantly, the POA Act states an agent's duty under a power of attorney is as follows:

> **(a) General rule.--**Notwithstanding any provision in the power of attorney, an agent that has accepted appointment shall:

*(Footnote Continued Next Page)*

<br>_____

(1) Act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest.

(2) Act in good faith.

(3) Act only within the scope of authority granted in the power of attorney.

**(b) Other duties.--**Except as otherwise provided in the power of attorney, an agent that has accepted appointment shall:

(1) Act loyally for the principal's benefit.

(1.1) Keep the agent's funds separate from the principal's funds unless:

(i) the funds were not kept separate as of the date of the execution of the power of attorney; or

(ii) the principal commingles the funds after the date of the execution of the power of attorney and the agent is the principal's spouse.

(2) Act so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest.

(3) Act with the care, competence and diligence ordinarily exercised by agents in similar circumstances.

(4) Keep a record of all receipts, disbursements and transactions made on behalf of the principal.

(5) Cooperate with a person who has authority to make health care decisions for the principal to carry out the principal's reasonable expectations to the extent actually known by the agent and, otherwise, act in the principal's best interest.

(6) Attempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent

*(Footnote Continued Next Page)*

good faith and with loyalty, creating a conflict of interest impairing her ability to act impartially on Caples' behalf, and failing to preserve Caples' estate plan. *Id.* ¶¶ 25-26. Further, Caples averred Purcell breached her fiduciary duty by unduly influencing Caples to sell her ownership interest in KP. *Id.* ¶¶ 29-32. Additionally, Caples argued Purcell breached her duties as her agent by retaining money belonging to Caples and failing to provide detailed information about the location of Caples' money. *Id.* ¶¶ 33-34. Caples also

_____

with the principal's best interest based on all relevant factors, including:

(i) The value and nature of the principal's property.

(ii) The principal's foreseeable obligations and need for maintenance.

(iii) Minimization of taxes, including income, estate, inheritance, generation-skipping transfer and gift taxes.

(iv) Eligibility for a benefit, program or assistance under a statute or regulation.

**(c)   Nonliability of agent.--**

(1) An agent that acts in good faith shall not be liable to a beneficiary of the principal's estate plan for failure to preserve the plan.

(2) An agent that acts with care, competence and diligence for the best interest of the principal shall not be liable solely because the agent also benefits from the act or has an individual or conflicting interest in relation to the property or affairs of the principal.

20 Pa.C.S. § 5601.3 (a), (b), (c)(1)-(2).

contended that Purcell breached her duties as agent by forcing Caples to write separate checks of $100,000 and $30,850 payable to Purcell. *Id.* ¶¶ at 35-40. Caples argued that Purcell improperly commingled the funds with her own and created a conflict of interest. *Id.* ¶¶ 37, 40.

Purcell filed responses to the objections to the accounting and petition for breach of fiduciary duty. Purcell then filed a petition to dismiss the objections to accounting and petition for breach of fiduciary duty because the orphans' court lacked jurisdiction of the claims.

On August 20, 2020, the orphans' court issued an order granting Purcell's petition for dismissal of both the objections and petition for breach of fiduciary duty. The court indicated that the dismissal of the petition for breach of fiduciary duty was without prejudice to file a civil action. This Court affirmed the order in part, vacated in part, and remanded with instructions. *In re Caples*, 262 A.3d 495 (Pa. Super. Aug. 16, 2021) (non-precedential decision). Relevantly, this Court vacated the orphans' court dismissal of Caples' petition for breach of fiduciary duty and directed the orphans' court to transfer the petition to the civil division of the trial court. This Court affirmed in all other respects. On December 8, 2021, the orphans' court transferred the case to the civil division at docket number 2021-C-2083 ("the Caples Action").

On May 21, 2019, KP filed an action against Caples and D'Alessandro for conversion, theft of funds, and unjust enrichment at docket number 2019-C-1595 ("the KP Action"). KP argued that Caples and D'Alessandro illegally

transferred $25,000 from KP's account to their joint account. Caples and D'Alessandro filed an answer with new matter. KP filed a response. KC likewise filed suit against Caples and D'Alessandro for conversion, theft of funds, and unjust enrichment at docket number 2019-C-1627 ("the KC Action"). The action arose out of the transfer of $20,000 from a KC account to a joint account controlled by Caples and D'Alessandro. Caples and D'Alessandro filed an answer with new matter and KC filed a response to the new matter.

Purcell then filed a breach of contract action against Caples at docket number 2019-C-1929 ("the Purcell Action"). Purcell argued that Caples borrowed $192,850 from Purcell to pay the entry fee to Fellowship Community. Purcell noted that a balance of $91,587 remained on the loan and Caples breached the terms of the note by failing to make the agreed-upon monthly payments. Purcell sought the balance owed plus pre- and post-judgment interest. Caples filed an answer, new matter, and counterclaim, arguing Purcell unlawfully took half the proceeds from the Whitehall Property and sewer refund while she was acting as Caples' power of attorney. Caples labeled this behavior as egregious and sought punitive damages. Purcell filed a reply to Caples' new matter and her own new matter. Caples filed a response. Subsequently, Caples was granted the right to amend her counterclaim and included a breach of fiduciary duty claim and a fraud/intentional misrepresentation claim. Purcell again filed a reply.

The trial court consolidated the four actions. The cases proceeded to jury trial, at which the trial court found that Purcell's October 7, 2018 removal of $23,873.70 from a joint PSECU account she shared with Caples to belong to Purcell as a matter of law and precluded the jury from deciding the issue. The jury otherwise made separate findings in each of the actions on January 31, 2023. Specifically, the jury found:

- Caples and D'Alessandro deprived KP of $25,000 belonging to KP, it would be inequitable for them to retain the money, and awarded KP $25,000;

- Caples and D'Alessandro deprived KC of $20,000, it would be inequitable for them to retain the money, and awarded KC $20,000;

- Caples breached the loan agreement with Purcell and awarded Purcell $61,973.06 plus interest, which it calculated to be a total of $70,201.80;

- Caples did not prove her claim of fraud against Purcell regarding the proceeds from the sale of the Whitehall Property; and

- Purcell breached her fiduciary duty with regard to the proceeds from the sale of the Whitehall Property and awarded Caples $131,291.54.

On February 9, 2023, KC, KP, and Purcell filed a motion for post-trial relief. Of relevance to this appeal, Purcell sought judgment notwithstanding the verdict ("JNOV") in favor of her and against Caples on the breach of fiduciary duty claim, or in the alternative, a new trial. KP, KC, and Purcell further argued that the amounts awarded to them should be molded to include pre- and post-judgment interest. On February 17, 2023, Caples, through Cullen and D'Alessandro, filed a motion for post-trial relief, raising numerous

- 11 -

claims.[3]  Ultimately, the trial court granted the motion to mold the verdict raised by KP, KC, and Purcell, and denied the motions in all other respects. Relevantly, the trial court molded the verdict in favor of Purcell to $77,461.86.

Relevant herein, in the Purcell Action, judgment was entered on June 21, 2023, in favor of Caples and against Purcell in the amount of $168,107 and in favor of Purcell and against Caples in the amount of $77,461.86.  On June 21, 2023, the court entered judgment in the Caples Action in favor of Caples and against Purcell in the amount of $168,107.[4]  Purcell and Caples appealed and cross-appealed from the entry of these judgments.[5]

Regarding the judgment entered against her, Purcell raises the following questions for our review:

A. Did the trial court err as a matter of law in refusing to enter judgment notwithstanding the verdict against [] Caples on her breach-of-fiduciary duty claim premised on the mere existence of a Power of Attorney, when no evidence was presented that [] Purcell acted as [] Caples' agent, particularly in connection with the 50/50 equal disposition of the proceeds from the sale of a jointly-titled parcel of real estate, and there was no other legal or evidentiary basis to find the existence of a fiduciary duty owed by [] Purcell to [] Caples?

---

[3] This motion was timely filed, because "[i]f a party has filed a timely post-trial motion, any other party may file a post-trial motion within ten days after the filing of the first post-trial motion."  Pa.R.C.P. 227.1(c).

[4] The judgments entered against Purcell for $168,107 in the Purcell Action and the Caples Action are the same.

[5] Caples did not file appeals from the judgments entered against her in the KP and KC Actions.

B. Did the trial court err as a matter of law in submitting Special Verdict Question No. 10 to the jury for determination ("Has [] Caples proven her claim for breach of fiduciary duty against [] Purcell regarding the disposition of the proceeds from the sale of the Fifth Street, Whitehall Property?"), given there cannot be a claim against [] Purcell for breach of fiduciary duty, when it is undisputed she did not act as[] Caples' agent, particularly with respect to the 50/50 equal distribution of the proceeds from the sale of the jointly-titled real estate, and there was no other legal or evidentiary basis to find the existence of a fiduciary duty owed by [] Purcell to [] Caples?

C. Did the trial court err as a matter of law in submitting a breach of fiduciary duty jury instruction, and one which was also inaccurate and misleading, absent any evidence that, during the nine-month-long period she was [] Caples' agent, [] Purcell exclusively exercised the powers granted to her, particularly with respect to the 50/50 equal distribution of the proceeds from the sale of the jointly-titled real estate, and there was no other legal or evidentiary basis to find the existence of a fiduciary duty owed by [] Purcell to [] Caples?

Purcell's Brief at 6.

In Caples' cross-appeal, she raises the following questions for our review:

A. Whether the trial court should have granted Caples' motion for a compulsory nonsuit against Purcell on her breach of contract claim, where Purcell, not Caples, was in breach of the agreement because Purcell had directed Caples to set aside the sum of $30,850.00 in a joint account with Purcell to pay for monthly loan payments, and Purcell unlawfully removed those funds and chose not to apply them to loan payments?

B. Whether Purcell's request to mold the verdict on the breach of contract claim was improperly granted because molding the verdict awarded Purcell additional interest against the jury's intent?

C. Whether the trial court properly submitted the breach of fiduciary duty claim to the jury when evidence established that Purcell breached her fiduciary duties to Caples?

- 13 -

D. Whether the trial court properly found that $23,873.70 held in a joint bank account belonging to Purcell and Caples belonged to Purcell as a matter of law?

E. Whether the trial court should have permitted Caples' discovery deposition to be admitted as substantive evidence at trial when Caples was available to testify at trial and did testify?

F. Whether the trial court should have limited the testimony of the former treating physician of Caples, so that he was not allowed to give his opinions and to fully testify regarding his care and treatment of Caples?

G. Whether the trial court should have permitted Caples to introduce evidence related to Purcell's contacts with Caples after Caples moved to Alabama when this was highly relevant to showing Purcell's financial motivations and lack of care for her mother, as well as to impeach Purcell?

H. Whether the trial court should have permitted Caples to present evidence at trial relevant to her claim for punitive damages, including evidence of Purcell's net worth and correspondence showing Purcell's ill-will and bad behavior, including Exhibits D-29 and D-42, and whether the trial court should have submitted the issue of punitive damages to the jury based on the overwhelming evidence presented at trial, as well as the excluded evidence, which demonstrated that Purcell engaged in outrageous and willful conduct?

Caples' Brief at 2-5 (issues reordered).

**Purcell Appeal**

Breach of Fiduciary Duty

Purcell contends that the trial court erred as a matter of law in denying her request for JNOV on Caples' breach of fiduciary duty claim. Purcell's Brief at 14, 18-19, 25. She argues that there is no evidence that she acted as Caples' agent in connection with the equal distribution of the proceeds from

- 14 -

the sale of the Whitehall Property and that the mere existence of the power of attorney does not make it so. *Id.* She observes that this Court made various findings that support her argument in the prior appeal from the orphans' court's decision, including that she did not engage in improper transactions while acting as the power of attorney, the orphans' court did not have jurisdiction of the case because the claims did not concern the exercise of the power of attorney, and the duties outlined in 20 Pa.C.S. § 5601.3 did not apply to actions undertaken by Purcell in her individual capacity. *Id.* at 15-17 (citing *In re Caples,* 262 A.3d 495). According to Purcell, section 5601.3 of the POA Act clearly applies only to actions taken by an agent while exercising the delineated powers, not in all transactions in which the principal chooses to engage. *Id.* at 17-18, 23-24. Purcell notes that under the power of attorney she signed, it expressly stated it would only apply to her acts as agent. *Id.* at 18. Purcell asserts that the sole act she took as power of attorney with respect to Whitehall Property was to sign a listing agreement while Caples was out of town, which Caples subsequently ratified and signed herself. *Id.* at 19, 21, 23. Caples signed all documentation related to the purchase and sale of the Whitehall Property, including making Purcell a record owner of the property, and Purcell contends she was not under any undue influence. *Id.* at 19-21, 23. Purcell also highlights that she did not have any role in distributing the proceeds of the sale of Whitehall Property—a settlement

agent distributed the proceeds to her as a record owner of the property. *Id.* at 19-20, 21.

> A motion for [JNOV] is a post-trial motion which requests the court to enter judgment in favor of the moving party. There are two bases on which the court can grant [JNOV].
>
> [One is that] the movant is entitled to judgment as a matter of law [and the other is that] the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. In an appeal from the trial court's decision to deny [a motion for JNOV, a court] must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner.
>
> Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact[. A JNOV] should be entered only in a clear case. [T]he entry of a [JNOV] is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury.

*DeVore v. Metro Aviation, Inc.*, 328 A.3d 1012, 1016-17 (Pa. Super. 2024) (citation omitted).

"[P]owers of attorney are strictly construed and the grant of special powers is not to be enlarged unless this is clearly intended." *In re Est. of Moskowitz*, 115 A.3d 372, 385 (Pa. Super. 2015) (citation omitted).

- 16 -

On May 21, 2018, Caples executed a general power of attorney, naming Purcell as her agent. General Power of Attorney, 5/21/2018, at 1-11. Subsequently, on October 11, 2018, Caples executed a durable general power of attorney, again naming Purcell as her agent. Durable Power of Attorney, 10/11/2018, at 1-12. Pursuant to this appointment, Purcell had the power to "buy or sell" real property on Caples' behalf. *Id.* at 3. As Purcell asserts, the document also expressly states that it imposes no duty on her as agent to exercise the granted powers, and that the duty to act of Caples' benefit attaches when Purcell exercises the granted powers. *Id.* at 1.

The record reflects that Caples bought the Whitehall Property in 2010, long before she appointed Purcell as her power of attorney; the deed specifically lists Purcell and Caples as "JOINT TENANTS WITH RIGHT OF SURVIVORSHIP." Deed, 2/5/2010, at 1 (emphasis in original). When the parties listed the Whitehall Property, Caples and Purcell were both listed as the sellers. Listing Contract, 9/8/2018, at 1, 6; Closing Disclosure, 10/18/2028, at 1. Following closing, the proceeds of the sale were distributed evenly between Caples and Purcell. *See* Letter, 10/18/2018 (indicating Caples and Purcell signed letter to settlement agent at closing stating: "We, the undersigned, the Sellers of the above premises, hereby authorize you to issue two separate checks for the proceeds from the sale of the said premises as follows: 1) To: 50% - Carole Caples, 2) To: 50% - Kathy Purcell.").

- 17 -

At trial, Caples testified that she bought the Whitehall Property in 2010, admitting Purcell loaned her money until her Maryland home sold. N.T., 1/27/2023, at 50-51. Caples indicated she paid the bills for the Whitehall Property. *Id.* at 51. She placed Purcell's name on the deed of the Whitehall Property based upon her husband's suggestion prior to his death that she not title property solely in her name, stating, that her plan was for Purcell to divide the property equally with her sisters if Caples died. *Id.* at 52; *see also id.* (wherein Caples stated that her husband had told her to put someone else on any deed if she was by herself). Caples admitted that she did not appoint Purcell as power of attorney until May 2018. *Id.* at 66. She further testified that D'Allesandro was in the room while Caples and Purcell signed the paperwork during closing on the Whitehall Property, and that D'Allesandro took her to the bank to deposit the checks from the house sale immediately after the closing. *Id.* at 59-60.

D'Alessandro testified that she was aware that Purcell's name would be placed on the deed of the Whitehall Property. N.T., 1/25/2023, at 200-01. She believed Purcell's name was on the deed "to streamline[] the inheritance process"; "if … something happened to Mom, … [Purcell] would be able to take care of things." *Id.* at 204. She noted that if Caples passed away after the purchase of Whitehall Property, it was her understanding that Purcell would sell the home because it was in her name and distribute the proceeds equally between herself, D'Alessandro, and Cullen. *Id.* at 205; *see also* N.T.,

1/26/2023, at 106. D'Alessandro admitted that there were no writings between the parties discussing this. N.T., 1/26/2023, at 103-04. She also testified that there was no discussion or agreement as to what would happen to the proceeds if Caples and Purcell sold the property before Caples died. N.T., 1/25/2023, at 205. She further acknowledged that there is no writing or other agreement that provided the money received by Purcell from the sale of the Whitehall Property would be applied to any money owed by Caples to Purcell or that Purcell was obligated to do anything in particular with the funds she received from the sale. N.T., 1/26/2023, at 160-61. D'Allesandro stated that she did not know Purcell would take half the proceeds of the sale of Whitehall Property. N.T., 1/25/2023, at 232.

Cullen testified that before buying the Whitehall Property, Purcell told her that she and Caples had decided to put Purcell's name on the deed. N.T., 1/27/2023, at 117. Like D'Allesandro, Cullen believed Purcell's name was placed on the deed to make it easier to sell the property if Caples died and to avoid inheritance taxes. *Id.* at 117, 119-20. Cullen was unaware of Caples' 2018 power of attorney. *Id.* at 132. Cullen acknowledged that there were no emails or texts relating to the titling of the Whitehall Property. *Id.* at 206.

Purcell testified Caples bought the Whitehall Property in February 2010. N.T., 1/24/2023, at 72, 105-06. The deed to the Whitehall Property named her and Caples as joint tenants with the right of survivorship. *Id.* at 106-07. She stated that Caples had not informed her in advance that her name would

be included on the deed, and she learned about it for the first time at closing when Caples purchased the Whitehall Property. *Id.* at 107-08, 232. She did not have any discussions about the titling of the property with her sisters and did not know anything about the alleged plan related to inheritance taxes in 2010. *Id.* at 231-32. It was Caples who wanted to place Purcell's name on the deed. *Id.* at 108. Purcell admitted she did not live in the home, pay any expenses, real estate taxes, insurance, or improvements to the home. *Id.* at 228-29.

Purcell testified that she became Caples' power of attorney in May 2018, but that she only exercised her role as power of attorney on one occasion— signing a listing agreement with a realtor to sell the Whitehall Property when Caples was out of town, but that this was done with Caples knowledge and agreement and Caples also subsequently signed the listing agreement. N.T., 1/25/2023, at 20-22, 35, 101, 103; N.T., 1/24/2023, at 121-24, 218-20, 233. She stated that Caples signed a paper at closing indicating she and Purcell would each receive fifty percent of the proceeds of the sale and the title company divided the money based on the deed. N.T., 1/25/2023, at 54, 84; N.T., 1/24/2023, at 235-36, 238, 242. Purcell signed documents at the closing of the sale of the Whitehall Property because she was a half-owner. *Id.* at 149, 235. According to Purcell, no one told her she was not entitled to half the proceeds of the sale of Whitehall Property. N.T., 1/25/2023, at 93; N.T., 1/24/2023, at 152. Purcell admitted she kept the sewer escrow refund

for the Whitehall Property despite never paying any expenses at the property. N.T., 1/25/2023, at 30-31. She waffled in her testimony as to whether she intended the proceeds would be used for her mother's benefit or for her own. *Id.* at 31-34, 47. She further testified that aside from investments in KP and KC, she did not have anything to do with Caples' bank accounts. N.T., 1/24/2023, at 153-54. Purcell indicated that Caples could make her own decisions throughout 2018. *Id.* at 220.

The trial court rejected Purcell's claim that JNOV should have been entered. Trial Court Opinion, 6/16/2023, at 23, 28. Without specificity, the trial court stated that the "vast majority of the testimony presented at trial regarding the history of dealings between Purcell and Caples" established a fiduciary relationship existed. *Id.* at 28. The trial court noted that before this Court transferred the case to the civil division, the orphans' court found that "Purcell's status as [an] agent under power of attorney is presumptive evidence that she occupied a confidential relationship with [] Caples and may well subject [] Purcell's dealings with her principal to a higher degree of scrutiny." *Id.* at 24 n.3 (citation omitted). As such, the trial court found dismissing the case from the orphans' court did not preclude Caples from raising the same "breaches of fiduciary duty," as it was solely a finding as to the orphans' court's jurisdiction of the matter. *Id.* (citation omitted). The trial court further stated that this Court only addressed the question of the

orphans' court's jurisdiction in the prior appeal and did not consider the substantive breach of fiduciary duty claim. *Id.*

Based upon the record before us, we conclude that the trial court erred in finding that Purcell breached a fiduciary duty to Caples when she retained fifty percent of the proceeds from the sale of the Whitehall Property. The record unequivocally shows that the decision to title the Whitehall Property in the names of both Purcell and Caples was Caples' decision alone. Per her testimony, she did so at the suggestion of her husband, prior to his passing, that she not be the sole name on the title to any home she owned after he died. N/T., 1/27/2023, at 52 (Caples testifying: "My husband … we talked about, you know, if I was by myself to put somebody else on … a deed for a house …, or don't do it alone. He wanted me to have somebody else, one of the girls or -- so that's what I did."). Purcell also was not named power of attorney until many years after the purchase. There is no suggestion that Purcell influenced Caples to name her as a joint tenant in the ownership of the Whitehall Property.

The same is true for the sale of the Whitehall Property. Caples named Purcell as her power of attorney a few months prior to the sale, but it was Caples' decision to move and to sell the Whitehall Property. *See* N.T., 1/27/2023, at 52-53. She made no allegation in her petition, and cites no evidence before this Court, suggesting Purcell was involved in the sale of the home as Caples' agent or that she withheld any funds in her capacity as

Caples' agent. Indeed, the sole evidence that Purcell acted as Caples' agent regarding the sale of the home in any respect was her signing the listing agreement with Caples' consent while Caples was out of town—a document Caples signed as well upon her return. **See** N.T., 1/24/2023, at 222, 224. Therefore, although the Whitehall Property was sold after the parties executed the powers of attorney in 2018, there is no evidence to suggest that the distribution of the net proceeds of the sale of the Whitehall Property was given to Purcell as power of attorney on behalf of Caples. **See Caples**, 262 A.3d 495, *4 ("Caples only challenged actions taken by [] Purcell in her individual capacity while serving as [] Caples' [power of attorney].") (emphasis in original). And as she was not acting as Caples' agent at the time of the sale of the Whitehall Property, Purcell's duties as power of attorney did not apply. Power of Attorney, 10/11/2018, at 1. ("This power of attorney does not impose a duty on your agent to exercise granted powers") (capitalization omitted).

The trial court is correct that the grant of a power of attorney to an individual may give rise to a finding that the parties are in a confidential relationship, and thus place a fiduciary duty upon the agent. **See** Trial Court Opinion, 6/16/2023, at 24 n.3[6]; **In re Est. of Fritts**, 906 A.2d 601, 608 (Pa.

_____

[6] The trial court states that the orphans' court "specifically stated that Purcell occupied a confidential relationship with Caples." Trial Court Opinion, 6/16/2023, at 24. This is inaccurate. Instead, as the trial court's footnote
*(Footnote Continued Next Page)*

Super. 2006) ("The clearest indication of a confidential relationship is that an individual has given power of attorney over her savings and finances to another party."). However, "[a] parent-child relationship does not establish the existence of a confidential relationship nor does the fact that the proponent has a power of attorney where the decedent wanted the proponent to act as attorney-in-fact." *Fritts*, 906 A.2d at 608 (quoting *In re Est. of Angle*, 777 A.2d 114, 123 (Pa. Super. 2001)). "A power of attorney will **not** raise the inference of a confidential relationship where the decedent sought that aid with his business affairs." *Angle*, 777 A.2d at 124 (emphasis added; citation omitted) (recognizing no confidential relationship where father appointed child to help handle his bills). Instead, where a parent names a child as power of attorney, one must look at the interactions between the parties:

> A confidential relationship exists when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. It is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.

*Fritts*, 906 A.2d at 608 (cleaned up); *see also Angle*, 777 A.2d at 125.

_____

correctly states, the orphans' court found that Purcell's appointment as power of attorney by Caples gives rise to an inference of a confidential relationship, "and may well subject [Purcell's] dealings with her principal to a higher degree of scrutiny," but that "it does not confer the Orphans' Court with jurisdiction to determine the validity of those transactions." *Id.* at 24 n.3.

Although Purcell was serving as power of attorney at the time of the sale of the Whitehall Property, we find no support for the trial court's conclusion that there was a confidential relationship between the two with respect to that transaction. The record does not support a finding that Purcell had an overmastering influence on Caples or that Caples was operating from a position of weakness in the relationship. To the contrary, all evidence shows that Caples made her own decisions concerning the purchase and disposition of the Whitehall Property. Purcell had little involvement in the sale, and any involvement she did have was pursuant to Caples' knowledge, assent, and written confirmation. There is simply no basis in the record to conclude that, at the time of the sale of the Whitehall Property, Purcell was in a position of overmastering influence, that the parties were not dealing on equal terms, or that Purcell wielded any power or authority in the transaction.

Thus, determining whether Purcell is entitled to the sale proceeds must be resolved based upon the language of the deed for Whitehall Property.

> When construing a deed, a court's primary object must be to ascertain and effectuate what the parties themselves intended. The traditional rules of construction to determine that intention involve the following principles. First, the nature and quantity of the interest conveyed must be ascertained from the deed itself and cannot be orally shown in the absence of fraud, accident or mistake. We seek to ascertain not what the parties may have intended by the language but what is the meaning of the words they used. Effect must be given to all the language of the instrument, and no part shall be rejected if it can be given a meaning. If a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it. ... To ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the

apparent object or purpose of the parties and the conditions existing when it was executed.

***Hunnell as Tr. of Hunnell Fam. Revocable Living Tr. v. Krawczewicz***, 284 A.3d 1192, 1197-98 (Pa. Super. 2022) (citation and paragraph break omitted).

Here, the deed listed Caples and Purcell as joint tenants with right of survivorship. ***See Est. of Reigle***, 652 A.2d 853, 854 (Pa. Super. 1995) ("Where the language of the deed is clear and unambiguous, the intent of the grantees must be gleaned solely from the deed's language."). No one disputes that Purcell was a joint tenant with a right of survivorship or claims that the deed's language was ambiguous. While Cullen and D'Alessandro indicate that the property was deeded in that manner for estate planning purposes, and (viewing the evidence in the light most favorable to Caples) Purcell stated she was holding the money for the benefit of Caples, the parties' intent is of no moment. The law is clear:

> The nature and quantity of the interest conveyed must be ascertained by the instrument itself and cannot be orally shown. Furthermore, in construing a deed, as in the case of a will, it is not what the parties may have intended by the language used but what is the meaning of the words.

***Id.*** at 854-55. Thus, when Caples sold the Whitehall Property, she and Purcell were entitled to an equal share of the proceeds. ***See In re Est. of Quick***, 905 A.2d 471, 474 (Pa. 2006) ("When two or more persons hold property as [joint tenants with right of survivorship], title to that property vests equally in those persons during their lifetimes"); ***see also Masgai v. Masgai***, 333 A.2d

861, 864 (Pa. 1975) (noting that the "fact that the payor takes title to property in the name of himself and another jointly is an indication of an intention of the payor to make a beneficial gift of an undivided interest in the property to the other person").[7]

There is no support for a finding that Purcell breached a fiduciary duty to Caples in either the purchase or sale of the Whitehall Property. Because Purcell, as a joint tenant with right to survivorship of the Whitehall Property, was entitled to a one-half share of the proceeds from the sale, we are constrained to conclude the trial court erred in denying Purcell's request for JNOV. We reverse this judgment and direct the trial court to enter JNOV in favor of Purcell.[8] Based upon our resolution of Purcell's first claim, we need not address her remaining claims.

## Caples Appeal

### Nonsuit – Breach of Contract

_____

[7] We additionally note that the jury found that Caples did not prove that Purcell committed fraud or intentional misrepresentations, including with respect to placing Purcell's name on the deed of the Whitehall Property. Verdict, 2/1/2023, at 4 (finding that Caples did not prove "her claim for fraud (intentional misrepresentation) against [] Purcell regarding the disposition of the proceeds from the [Whitehall Property]").

[8] Purcell is entitled to half the proceeds of the sale of the Whitehall Property. However, she has not raised a claim about the sewer refund, and in fact conceded at trial that she never paid any expenses on the property. *See* N.T., 1/25/2023, at 30-31. As such, Caples is entitled to the entire sum of the sewer refund.

Caples argues that the trial court erred in failing to grant her motion for compulsory nonsuit on Purcell's breach of loan claim. Caples' Brief at 38. Even viewing the evidence in a light most favorable to the Purcell, she asserts that it could not be interpreted as Caples breaching the agreement. *Id.* at 39. Caples highlights that there is no evidence she failed to make monthly payments and contends that the trial court erred in stating that there was evidence to support the jury's award. *Id.* at 39-40. She made a $100,000 payment in November 2018 and made the required monthly payments thereafter. *Id.* Caples asserts she relied on Purcell's representations to write a check payable to herself for $30,850, and that Purcell would deposit the money to make the loan payments. *Id.* at 40, 44. Caples claims Purcell removed over $28,000 from the joint checking account, which was to be used to repay the loan, and moved it into her personal account. *Id.* at 41-42. According to Caples, her payment of the $30,850 is an absolute defense to the breach of loan agreement. *Id.* at 43. She maintains that Purcell's actions were a breach of her fiduciary duties. *Id.* at 43-44.

Our standard of review for a denial of a motion for compulsory nonsuit is as follows:

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiffs' evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial

- 28 -

court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered.

A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

*Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1274 (Pa. Super. 2012) (citation omitted).

The record reflects that Caples testified that the entry fee into Fellowship Community was $203,000 and that Purcell loaned her $192,850 to help her pay the entry fee. N.T., 1/27/2023, at 55-56, 62, 129; *see also* N.T., 1/26/2023, at 152 (D'Alessandro admitted Purcell loaned Caples the money to pay the entry fee at Fellowship Community), 1/25/2023, at 229 (same); N.T., 1/24/2023, at 118, 225-26 (Purcell stated she and her husband loaned Caples the entry fee money), 134, 226-27, 241-42 (signed a promissory note loaning Caples $192,850); *see also* Promissory Note, 7/1/2018. Caples paid Purcell a lump sum of $100,000 on November 24, 2018, and Purcell made a new amortization schedule with a principal amount owed of $92,850, and monthly payments of $469.71. N.T., 1/25/2023, at 33, 54, 55; N.T., 1/24/2023, at 138-39, 140-41, 251. Caples deposited $30,850 into a joint bank account she shared with Purcell, from which Purcell could take the monthly payments to pay off the loan. N.T., 1/25/2023, at 34; N.T., 1/24/2023 at 142-43, 187, 251. Purcell took five payments from the account between January and May 2019. N.T., 1/24/2023, at 145. Purcell then took

the remaining money from the joint bank account and moved it to her personal account, stating that she feared her sisters would take the money out of the account. N.T., 1/25/2023, at 35-36; N.T., 1/24/2023, 155-57, 167. Purcell did not receive any other monthly payments after she moved the money. *Id.* at 170-71. Purcell indicated that she applied this money to the remaining balance on the loan. *Id.* at 193.

The parties do not dispute that Purcell loaned Caples $192,850 to move into Fellowship Community. Caples paid Purcell $100,000 lump payment and made five separate payments of $469.71 per month. Further, Purcell transferred over $28,000 to her personal account from a joint account she shared with Caples and Caples made no further payments on the loan. Thus, the jury could find that Caples was in default of the remaining balance of the loan.[9] As there was evidentiary support for the jury's determination, the trial court properly denied the motion for compulsory nonsuit. *See Singularity Clark, L.P.*, 40 A.3d at 1274.

## Molded Verdict

Caples next contends that the trial court erred in molding the verdict on the breach of contract claim, arguing the jury already awarded Purcell interest. Caples' Brief at 45. According to Caples, the jury calculated the amount owed to Purcell, including interest, to total $70,201.80, and therefore, the trial

---

[9] D'Alessandro indicated Caples received $152,250 from Fellowship Community after she moved out. N.T., 1/26/2023, at 55.

court's order providing six percent interest on the balance of $61,973.06, and a final judgment of $77,461.86, was contrary to the clear intent of the jury. *Id.* at 45-47.

> It is well settled that a trial court in this Commonwealth has the power to mold a jury's verdict to conform to the clear intent of the jury. The power of a trial judge to exercise his discretion in molding a verdict to fit the expressed desires of the jury is a cornerstone of the jury system. Moreover, verdicts which are not technically correct in form but which manifest a clear intent on the part of the jury may be corrected without resort to further jury deliberations or the grant of a new trial.

*Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 639 (Pa. Super. 2019) (citations, quotation marks, and paragraph break omitted).

Here, the jury's verdict stated that on the loan agreement, Caples owed Purcell "$61,973.06 plus interest." Verdict, 2/1/2023, at 4. The jury then calculated the final amount at the time of the verdict to be $70,201.80. *Id.* Purcell filed a post-trial motion, requesting that the trial court mold the verdict to include pre- and post-judgment interest on the $61,973.06 award. Motion for Post-Trial Relief, 2/9/2023, at 11-12. Purcell argued that the jury should have calculated interest from the day of the breach, June 10, 2019, until the day of the verdict, February 1, 2023, which would have added $13,579.74 of interest to the judgment. *Id.* at 12. The trial court granted this motion and molded the verdict on June 16, 2023, to include the days from February 1, 2023, to June 16, 2023, for a final total of $77,268.25 plus ongoing interest until the amount is satisfied. Molded Verdict, 6/16/2023.

The trial court did not err. The interest accruing on the verdict is $10.19 per day. The jury clearly found that Purcell was entitled to interest on the base amount of its verdict, but its calculation did not include interest that continued to accrue. To that end, the trial court is free to mold the verdict by adding interest that was continuing to accrue until the date of the molded verdict and any time thereafter that the judgement was not paid. *See Carlini*, 219 A.3d at 639; *see also Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 591 (Pa. Super. 2003) (noting courts have authority to mold the verdict to add interest that is due). Thus, Caples' claim in this regard is without merit.

<u>Breach of Fiduciary Duty Jury Instruction</u>

Caples contends that the trial court properly submitted the breach of fiduciary duty claim to the jury, and the jury properly found Purcell breached her fiduciary duty. Caples' Brief at 47, 65. Caples argues that evidence established that Purcell was Caples' power of attorney, Purcell acted as Caples' agent, and Purcell could breach her fiduciary duties even without being her agent. *Id.* at 47, 49-59, 61-65; *see also id.* at 62-63 (noting Purcell was in a confidential relationship with Caples that was not based on the power of attorney). Caples claims that because there was evidence supporting the breach of fiduciary duty claim, the jury was required to review the facts and the instruction was proper. *Id.* at 49.

Here, Caples is not seeking any affirmative relief, and instead merely argues that the trial court properly instructed the jury on Purcell's breach of

fiduciary duty. In any event, as noted above, we concluded that trial court erred in failing to grant Purcell's motion for JNOV, as she did not breach her fiduciary duty to Caples related to the sale of the Whitehall Property. As such, we need not further address this claim, as it has no bearing on the resolution of the case.

### Purcell's removal of $23,873.70 from Joint Account

Caples next contends that the case must be remanded for a new trial limited to the issue of Purcell's removal of $23,873.70 from the joint account shared by Caples and Purcell to Purcell's personal account. Caples' Brief at 75-81. Caples claims she raised this claim below in the Caples Action and the Purcell Action (as a counterclaim), arguing that Purcell breached her fiduciary duty by retaining Caples' money and hiding it. *Id.* at 81-82 n.10.[10] She asserts that limited evidence was presented on this issue, and only evidence that Purcell withdrew money from the joint account was admitted. *Id.* at 76-77. Caples notes that the trial court allowed the introduction of this evidence at trial but refused to allow the jury to consider the amount owed to Caples,

_____

[10] This contention is questionable. *See, e.g.,* Petition for Breach, 9/18/19, ¶¶ 33, 34; *accord* Caples' Answer with New Matter and Amended Counterclaim, 11/5/2020, ¶ 79; *see also* Trial Court Opinion, 6/16/2023, at 39 (noting that "[o]ther than commingling, no other claims were specifically pled in any of the counterclaims or in the [o]rphans' [c]ourt petition"); *id.* at 38-39 ("Caples argues in the post-trial motion that the court must order a new trial on the issue of whether Caples is entitled to the $23,873.70 that was removed by Purcell from the 8699 Account. Caples does not even brief the asserted premise of the commingling issue."). Although arguably waived, for the reasons that follow, we also find it to be meritless.

believing Purcell's counsel's self-serving assertion that the money belonged solely to Purcell. *Id.* at 77, 79. Caples asserts that there was no evidence presented establishing that Purcell transferred the money into the joint account in the first instance. *Id.* at 78, 80-81. According to Caples, since both parties are asserting ownership over the funds in the account, the jury, as factfinder, should have decided this issue. *Id.* at 80.

"A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent." 20 Pa.C.S. § 6303(a). "Proof that a different intent existed and a gift was given is the burden of the party who is claiming to have received the benefit of that gift. Such proof must be established by clear, precise, direct and convincing evidence." *Wilhelm v. Wilhelm*, 657 A.2d 34, 37 (Pa. Super. 1995).

Purcell testified that she and her husband funded the joint account at issue, and that Caples never contributed money to that account. N.T., 1/25/2023, at 107-09. Caples' counsel admitted that they have no evidence to establish Caples contributed to this joint account. N.T., 1/27/2023, at 169. Ultimately, the trial court found that the $23,873.70 in the joint account belonged to Purcell as a matter of law, noting Caples did not have any evidence that she put money into that joint account, while Purcell testified that she and her husband funded that particular account. N.T., 1/27/2023, at 171, 172.

The record supports the trial court's findings. The only evidence presented at trial about that account was from Purcell, who testified that she contributed all of the money in the joint. Caples conceded at trial that she had no evidence to support the proposition that she contributed to the joint account. *See* N.T., 1/27/2023, at 169. As such, the trial court did not err as a matter in law in finding that the money belonged to Purcell without allowing the claim to be presented to the jury. *See Deutsch, Larrimore & Farnish, P.C. v. Johnson*, 848 A.2d 137, 144 (Pa. 2004) (concluding that the party who contributed all of the funds present in the account, where there was no clear and convincing evidence of an intent to make a gift, owned the account's assets alone). Therefore, Caples' claim in this regard is without merit.

Admission of Caples' Discovery Deposition

Caples contends that her discovery deposition should not have been admitted at trial where she was available to testify. Caples' Brief at 82. Caples argues that the excerpts of the deposition admitted into evidence by Purcell were inflammatory and prejudicial. *Id.* Caples acknowledges that a deposition may be admitted by an adverse party for any reason under Civil Rule 4020, but argues that its admissibility was still subject to evidentiary objections. *Id.* at 83-84. Caples notes in this case under Rule of Evidence 804, prior testimony is admissible only if the declarant is unavailable at trial to testify. *Id.* at 84. She emphasizes that she was available to testify, and the trial court therefore erroneously admitted her prior statements made

during the deposition. *Id.* Caples also argues that the trial court erred in admitting only a portion of the deposition, and should have admitted it in its entirety. *Id.* at 85-86.

Pennsylvania Rule of Civil Procedure 4020 states the following, in relevant part:

> (a) At the trial, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had notice thereof if required, in accordance with any one of the following provisions:
>
> \* \* \*
>
> (2) The deposition of a party … may be used by an adverse party for any purpose.

Pa.R.Civ.P. 4020(a)(2). "In general, therefore, the test of admissibility of a deposition under Rule 4020(a)(2) is the same as that for the admissibility of like testimony offered by a witness on the stand in open court." *Jistarri v. Nappi*, 549 A.2d 210, 216 (Pa. Super. 1988).

The record reflects that Purcell sought to admit excerpts of Caples' deposition as an exhibit to be used for "later argument." N.T., 1/25/2023, at 10. Caples objected, noting she was present and could be questioned about the deposition. *Id.* Later during trial, Purcell's counsel stated that he intended to offer the deposition excerpts as an exhibit, but not read from it or publish it to the jury. *Id.* at 128-29. Over Caples' objection, the trial court admitted the exhibit as Plaintiff's Exhibit 54. *Id.* at 130-31. Subsequently, Caples

admitted other portions of her deposition in separate exhibits, Defense Exhibits 96, 96A. N.T., 1/31/2023, at 7.

The trial court addressed Caples' claim as follows:

The court ruled that the deposition of a party could be admitted under Rule of Civil Procedure 4020(a)(2) which permits it to be used at trial by the adverse party for any purpose. Interestingly, though, it was never read into evidence by Purcell in the case. At most, it was used to question D'Alessandro about her presence during her mother's deposition and her mother's desire to move to Fellowship Community. N.T.[, 1/26/2023, at] 56-57. This was summarized again by Purcell's attorney in his closing argument. N.T.[, 1/31/2023, at] 35.

Regarding review of the evidentiary rulings made by the court, Caples has not presented any argument to support a conclusion that the court abused its discretion in making this evidentiary ruling. There was no showing that the law has been misapplied or overridden, that the court's judgment was manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. In the alternative, if there was an abuse of discretion, Caples has failed to present how the transcript, albeit admitted but never seen by the jury, was harmful or prejudicial to Caples. Hence, there is no correlation between the transcript and a resulting effect upon the verdict.

Trial Court Opinion, 6/16/2023, at 44-45.

In her brief before this Court, Caples does not indicate what statements from the deposition, if any, were inflammatory, prejudicial, or otherwise improperly admitted. *See* Pa.R.A.P. 2119(a) (stating that the argument should include "such discussion and citation of authorities as are deemed pertinent"). In fact, Caples fails to establish that any of her statements in the deposition were read or published to the jury. Furthermore, Caples testified at trial and was capable of answering any questions that were included in the

deposition. As Caples has not established the trial court abused its discretion in admitting the excerpts of her deposition testimony, she is due no relief on this claim.

<u>Limiting Testimony of Caples' Doctor</u>

Caples contends that trial court abused its discretion in limiting her examination of her former treating physician, Dr. Daniel M. Spatz. Caples' Brief at 86. Caples argues that she offered Dr. Spatz as a lay witness, and he should have been permitted to testify about any diagnoses he had made while treating Caples. *Id.* at 86-87, 88-89. Caples asserts that the trial court erred in limiting Dr. Spatz's testimony to his "specific observations." *Id.* at 89. Caples claims that Dr. Spatz's testimony was relevant for consideration of punitive damages and to provide the jury with information about Caples' cognitive decline and Purcell's knowledge of her decline. *Id.* Caples seeks a new trial at which Dr. Spatz would be permitted to testify to his diagnoses and opinions. *Id.*

We review the admission or exclusion of testimony from a lay witness for an abuse of discretion. *Risperdal Litig. W.C. v. Janssen Pharms., Inc.*, 174 A.3d 1110, 1118 (Pa. Super. 2017). If we determine the trial court's evidentiary ruling was an abuse of discretion, the error "does not warrant a new trial unless it was harmful or prejudicial to the complaining party." *Flenke v. Huntington*, 111 A.3d 1197, 1200 (Pa. Super. 2015) (citation and quotation marks omitted).

Pennsylvania Rule of Evidence 701 provides as follows:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a)    rationally based on the witness's perception;

(b)    helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c)    not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

At trial, Caples' counsel stated that he was introducing Dr. Spatz as a lay witness to identify dates of his appointments with Caples and what he observed at the visits. N.T., 1/25/2023, at 167-68, 172. The trial court indicated that Dr. Spatz could only testify as a "lay witness to his observations, not medical diagnoses or opinions." *Id.* at 179.

Thereafter, Dr. Spatz testified that Caples was his patient for approximately four years, including between December 2017 and February 2019. *Id.* at 183. Dr. Spatz indicated that Caples had an appointment with him in December 2017, and that he had a concern about her memory on that date. *Id.* at 183-84. Dr. Spatz further testified that there were no changes at a September 2018 appointment with Caples. *Id.* at 187.

Subsequently, Caples introduced the video deposition of an expert witness, Dr. Robert Gordon, to testify regarding Caples' mental capacity and weakened intellect. N.T., 1/26/2023, at 185. Dr. Gordon was accepted as an expert witness regarding issues of weakened intellect and diminished capacity

on the part of individuals. N.T., 9/8/2022, at 20-21. Dr. Gordon testified that he reviewed Caples' medical records and neuropsychological tests conducted in August 2018, and opined that Caples had a weakened intellect at the time Purcell acted as her power of attorney. *Id.* at 21, 26-33, 36-38.

We conclude that the trial court properly limited Dr. Spatz's lay testimony to his observations. *See* Pa.R.E. 701. Rule 701 expressly precludes a lay witness from providing testimony "on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* Caples did not offer an expert report from Dr. Spatz or offer his testimony as an expert witness. *See* Trial Court Opinion, 6/16/2023, at 46 (stating that "without an expert report from Dr. Spatz and offering his testimony as an expert witness, the court was not of the opinion that Dr. Spatz could offer anything other than his observations of Caples"); *see also* N.T., 1/25/2023, at 179.

Caples did, however, offer the expert testimony of Dr. Gordon, who opined that Caples had a weakened intellect at the time Purcell was Caples' power of attorney. Any further testimony by Dr. Spatz regarding his mental capacity diagnoses of Caples would have been cumulative of this properly admitted testimony. *See* Trial Court Opinion, 6/16/2023, at 46-47 ("Since the testimony of the expert witness, Dr. Gordon, was received and heard by the jury on precisely the same conclusions that Caples wanted Dr. Spatz to attest, the testimony of Dr. Spatz, even if admissible would have been duplicative."); *see generally Blumer v. Ford Motor Co.*, 20 A.3d 1222,

1232 (Pa. Super. 2011) (concluding that even if the trial court erred in admitting evidence, the content of the disputed evidence was cumulative to admissible evidence, and thus, any error was harmless). Thus, we cannot conclude the trial court abused its discretion and a new trial is not required, as the evidence of Caples' weakened intellect was presented to the jury and Caples suffered no prejudice.

<u>Admission of Purcell's Contacts with Caples</u>

In her final claim, Caples contends that trial court abused its discretion in sustaining Purcell's objections related to Purcell's limited contacts with Caples following Caples' move to Alabama to live with D'Alessandro. Caples' Brief at 90-91. Caples argues Purcell's failure to maintain contact with Caples was "highly relevant to revealing Purcell's true motives regarding her behavior towards her mother." *Id.* at 90. Caples contends that Purcell ambushed Caples during her deposition in Alabama and that Purcell otherwise contacted Caples only when it would benefit Purcell financially; the evidence would have shown her lack of care and concern for Caples. *Id.* at 90-91. Caples asserts this testimony would have "changed the [jury's] minds on credibility issues involving Purcell." *Id.* at 91.

"[T]he admission or exclusion of evidence is within the sound discretion of the trial court." *Blumer*, 20 A.3d at 1226 (citation omitted). "In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by

the trial court upon a showing that it abused its discretion or committed an error of law." ***Id.*** (citation omitted).

The trial court rejected Caples' claim, stating, in pertinent part:

As for the relevance of the proposed evidence and testimony to the fraud/intentional misrepresentation claim, Caples argues that they illustrate Purcell's motives to deceive and control Caples, Purcell's true motives regarding her behavior toward her mother and her financial motives. These assertions regarding motive do not persuade the court that they were relevant to the cause of action as the motive of Purcell is not an element to the cause of action for fraud/intentional misrepresentation. Nowhere in the instructions to the jury would they have been told to consider the motive of the party as something that they needed to weigh in performing their duty as jurors.

Trial Court Opinion, 6/16/2023, at 47.

"Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action." Pa.R.E. 401.

Here, Caples argued the evidence of Purcell's actions at the deposition was relevant and admissible to show the degree of control Purcell exercised over Caples, and the fear Caples felt about Purcell. N.T., 1/25/2023, at 13-14. The trial court rejected Caples' claim, noting that the deposition "happened long after the time frame of your case." ***Id.*** at 14.

Caples has not established that Purcell's presence at the deposition was relevant to her causes of action against Purcell. ***See*** Trial Court Opinion, 6/16/2023, at 47. Likewise, Caples fails to show through any reasoned

analysis that Purcell's motives to contact Caples after moving to Alabama was relevant to her claims. *See id.*; Pa.R.A.P. 2119(a). Because the admission of this evidence was not relevant to Caples' breach of fiduciary duties and fraud/intentional misrepresentation claims against Purcell, we conclude that the trial court did not abuse its discretion in the trial court's determination to exclude this evidence. Thus, Caples' final claim is without merit.

Punitive Damages

Caples finally contends that she is entitled to punitive damages based on Purcell's outrageous conduct in filing her action and Purcell's breach of her fiduciary duty to Caples. Caples' Brief at 65. She argues that she attempted to present evidence of her entitlement to punitive damages throughout trial but it was rejected by the trial court. *Id.* at 68-72, 73, 75.[11] Caples states that throughout trial, she attempted to introduce Purcell's repeated threatening and harassing statements and Caples' feelings about Purcell's treatment of her. *Id.* at 69-72. Caples concludes that she is entitled to a new

_____

[11] We note that Caples incorporates by reference her brief in support of her post-trial motion, where she detailed sixteen instances of Purcell's outrageous conduct, which would have allowed a jury to find that she was entitled to punitive damages. Caples' Brief at 73, 74. "We do not permit parties to incorporate by reference arguments made in other briefs or pleadings." *Franciscus v. Sevdik*, 135 A.3d 1092, 1097 (Pa. Super. 2016). Thus, we will not consider the sixteen instances of Purcell's conduct. *See Deal v. Children's Hosp. of Philadelphia*, 223 A.3d 705, 715 (Pa. Super. 2019) (concluding that where an "appellant's argument on an issue merely refers to or incorporates by reference prior legal filing, that issue is waived").

trial on punitive damages where the two exhibits and Purcell's net worth would be admissible. *Id.* at 75.

"Punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the rights of others." *J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 415 (Pa. Super. 2012) (citation omitted). "Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct." *Id.* at 415-16 (citation omitted); *see also Bert Co. v. Turk*, 298 A.3d 44, 61 (Pa. 2023).

> Outrageous conduct is an act done with a bad motive or with a reckless indifference to the interests of others. Reckless indifference to the interests of others, or as it is sometimes referred to, wanton misconduct, means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

*Weston v. Northampton Personal Care, Inc.*, 62 A.3d 947, 961 (Pa. Super. 2013) (citation and quotation marks omitted). "The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact[]finder and will not be disturbed by an appellate court so long as that discretion has not been abused." *J.J. DeLuca Co.*, 56 A.3d at 416 (citation omitted).

As we conclude above, Purcell did not breach any fiduciary duty in retaining half of the proceeds from the sale of the Whitehall Property. The

language of the deed controlled the allocation of the sale proceeds to Purcell and Caples. Therefore, Caples has not established the recklessly indifferent conduct by Purcell which would permit a jury to award punitive damages. *See Weston*, 62 A.3d at 961 (concluding that where the appellant failed to prove that the appellees breached their fiduciary duty to him, appellant cannot show that that the appellees' "conduct was so outrageous as to demonstrate willful, wanton or reckless conduct," and therefore the trial court properly did not award punitive damages). Based on this conclusion, the trial court also did not abuse its discretion in precluding Caples' request to admit Purcell's and Caples' communications. Caples' claim is without merit.

Judgment affirmed in part and reversed in part. Case remanded for further proceedings. Jurisdiction relinquished.

President Judge Emeritus Ford Elliott joins the memorandum.

President Judge Emertius Panella files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/14/2025